IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RAHN MONREA'L, et al.          :          CIVIL ACTION
                               :
          v.                   :
                               :
ADAM LAMB, et al.              :          NO. 15-4126

MEMORANDUM

Bartle, J.                                      January 21, 2016

        Plaintiffs Rahn Monrea'l and Patricia Monrea'l are
co-owners of plaintiff Monrea'l Enterprises, Inc., doing business
as Delaware County Animal Control ("DCAC"),[1] a Pennsylvania
corporation engaged in the business of capturing and relocating
stray domestic animals and feral animals.  They have sued
defendants as a result of the cancellation of their animal control
contracts with a number of municipalities in Delaware County.

        Before the court are four motions to dismiss plaintiffs'
second amended complaint.  The motions are filed by:  Delaware
County, Pennsylvania ("Delaware County"); the Animal Protection
Board of Delaware County ("DCAPB"); Kristin Donmoyer ("Donmoyer")
in her individual capacity as Director of the Dog Law Enforcement
Office of the Pennsylvania Department of Agriculture; Joseph
Loughlin ("Loughlin") in his individual capacity as a Pennsylvania
Dog Warden; the Chester County Society for the Prevention of

---

1.  Monrea'l Enterprises, Inc. also does business as S&S Pest
Control.  Plaintiffs have stipulated that S&S Pest Control is
not a party in this action.  See Doc. # 32.

Cruelty to Animals, Inc. ("CCSPCA"); and CCSPCA's Executive Director Adam Lamb ("Lamb") in both his personal and official capacities.[2]  All ask the court to dismiss the second amended complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, while Delaware County argues in the alternative that it is entitled to a more definite statement pursuant to Rule 12(e).[3]

Plaintiffs' second amended complaint pleads violations of their "Fifth and Fourteenth Amendment rights to pursue chosen occupation and to private employment," conspiracy to violate the same rights, malicious abuse of process, and conspiracy to commit malicious abuse of process, all under 42 U.S.C. § 1983.  They also allege under Pennsylvania law tortious interference with business relationships and prospective business relationships and commercial disparagement.

I.

The facts set forth in the Second Amended Complaint, taken in the light most favorable to plaintiffs, are as follows.

---

2.   Donmoyer and Loughlin file their motion together, as do CCSPCA and Lamb.

3.   In their motion, CCSPCA and Lamb also make a single reference to the fact that they are seeking dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1).  They follow this with no argument, citation to authority, or other discussion of Rule 12(b)(1) or of the standard applicable to motions filed under that Rule.  We will therefore disregard CCSPCA and Lamb's reference to Rule 12(b)(1).

Until early 2012, stray domestic animals captured in Delaware County were sent to the Delaware County Society for Prevention of Cruelty to Animals ("DCSPCA"). However, in early 2012, DCSPCSA stopped accepting strays. In response, seeking to establish an independent animal shelter, Delaware County authorized the formation of the DCAPB, a non-profit corporation. It did so by authorizing Francis Catania, Esq., whom plaintiffs identify as Delaware County's agent, to file articles of incorporation with the Pennsylvania Secretary of State subject to the County Council's approval. Those articles provided that DCAPB would "offer animal control services, shelter to stray domestic animals, and otherwise work to prevent unwanted animals from running at large."

When it became clear that DCAPB would not be able to establish a new animal shelter on schedule, DCAPB and Delaware County entered into a contract with CCSPCA pursuant to which CCSPCA agreed to house stray domestic animals captured in Delaware County. For each animal delivered to CCSPCA, DCAPB would pay the shelter a $250 fee, which would then be reimbursed to DCAPB by the municipality in which the animal had been captured. The contract further provided that CCSPCA would receive a guaranteed minimum monthly payment of $30,000, equivalent to the fees for 120 animals. If fewer than 120 animals were delivered to CCSPCA in a given month, DCAPB would make up the difference between the amount actually paid to CCSPCA and the $30,000 minimum. Delaware County

-3-

would thereafter reimburse DCAPB for that sum.  In fact, deliveries
of strays from Delaware County to CCSPCA regularly fell far short
of the monthly quotas set forth in the contract.

Plaintiff DCAC held contracts with five townships, 13
boroughs, and one municipal housing authority within Delaware
County.  Pursuant to those agreements, DCAC would capture stray
domestic animals within the covered townships, boroughs, and
housing district and deliver the animals to CCSPCA.[4]  According to
plaintiffs, DCAC's success was predicated on these contracts and on
its continued access to CCSPCA's shelter facilities.

Rather than delivering animals to CCSPCA individually as
soon as they were captured, plaintiffs chose "as a matter of
practice" to deliver them "all at once . . . due to the time, cost
and interruption of work-flow that would inevitably result from
repeated round-trip travel to and from areas of Delaware County."
Plaintiffs aver that in doing so, they were "complying with the law
by making every reasonable effort to locate stray animal [sic]
owners prior to transporting them to CCSCA's [sic] facilities."

Plaintiffs contend that because Delaware County hoped to
avoid compensating CCSPCA for the monthly shortfalls in deliveries
of stray animals, CCSPCA and DCAPB "agreed to take steps to
eliminate Plaintiffs and other private animal control companies as

---

4.  Plaintiffs have not provided copies of any of these
contracts to the court.

providers of animal control services to local municipalities and transfer completely all animal control business operations in Delaware County to CCSPCA." They plead on information and belief that Lamb and CCSPCA, "with the backing of a member or members of the Animal Protection Board having apparent authority to do so," approached Donmoyer, who was the Director of the Dog Law Enforcement Office of the Pennsylvania Department of Agriculture, and asked for her help in "discrediting" DCAC.

According to plaintiffs, this led Donmoyer to send Rahn Monrea'l a letter dated March 4, 2015, in which she stated:

> Our Bureau has received complaints that stray dogs . . . are not being taken to a licensed kennel facility as required by the Dog Law Act 119. Rather, individuals finding stray dogs are being told by your organization to hold a stray until the owner can be located which is in direct conflict with what the Dog Law requires.

Donmoyer reminded Monrea'l to "ensure that your animal control organization maintains compliance with the Dog Law and its related regulations with regards to the handling of stray dogs within Delaware County." Failure to do so, she wrote, "could, and likely would, result in appropriate action by the Bureau of Dog Law Enforcement." Donmoyer shared the contents of her March 4, 2015 letter with Lamb, and plaintiffs plead on information and belief that she also shared the letter with "a member" of DCAPB.

Lamb subsequently directed a letter dated April 16, 2015 to "[a]ll Delaware County municipal governments."  In relevant part, it stated that CCSPCA was "extending an offer to the [DCAPB] the opportunity to provide full Animal Control services and Humane Law Enforcement to all Delaware County Municipalities contracted with the DCAPB."  Lamb's letter went on to detail the fees associated with CCSPCA's proposed animal control services.  It noted that the fees associated with individual stray animals would be "billed to and paid by the DCAPB each month just as the monthly billing has occurred throughout the contract term."  Lamb also stated that CCSPCA was authorized to provide, and would begin offering, "nuisance wildlife removal services."  Lamb concluded: "We're happy to be working with the DCAPB to bring continuity to the animals of Delaware County.  If your municipality would like to partner with the DCAPB and the CCSPCA to provide animal control services, please contact the DCAPB."

Plaintiffs plead that during the spring of 2015, unbeknownst to them, Lamb "individually and as executive director of the CCSPCA asked Defendants Donmoyer and Loughlin to file charges against [DCAC] alleging that Mr. Monrea'l and [DCAC] were systematically engaged in violations of Pennsylvania law concerning the proper care and transport of stray domestic animals to CCSPCA's shelter."  On or about June 3, 2015, Donmoyer, "in consultation with" Lamb, directed Loughlin, who was a Pennsylvania Dog Warden,

to file two "non-traffic citations" against DCAC in Magisterial
District Court in Upper Darby, Pennsylvania.  Plaintiffs assert
that Donmoyer and Loughlin issued these citations without probable
case and "based upon knowingly falsified allegations claiming that
Plaintiffs were in violation of state animal protection laws and
regulations."

The citations charged DCAC with violating 3 Pa. Stat.
§ 459-302.  The first of the two citations, written by hand,
described the "nature of offense" as follows:  "It shall be the
duty of animal control to seize and detain any dog found running at
large may humanely kill any dog deemed a threat to public health
and welfare after consideration."  The second described the "nature
of offense" by stating:  "Animal control must feed and detain for
48 hours then taken [sic] to a licensed kennel open to the public
so dog may be viewed [illegible] Humane Society."[5]  Below the
"nature of offense" category, each citation listed a date of June
3, 2015, a time of 10:00, and a location of 1500 Garrett Road,
Upper Darby, Delaware County.  Although the citations displayed
"filed" dates of June 11, 2015, they were not actually filed until
June 23, 2015.  Rahn Monrea'l was not served with the citations
until July 2, 2015.

_____

5.  These descriptions appear to paraphrase the text of
paragraphs (a) and (c) of § 459-302.

According to plaintiffs, at some point on or before June 11, 2015, Donmoyer or Loughlin (or both) gave Lamb advance notice that the citations would be filed.  Plaintiffs allege on information and belief that Donmoyer and Loughlin also "canvassed local businesses known to be doing business with Monrea'l and [DCAC] and warned them upon pain of prosecution and/or loss of business privileges to have no further dealings with them."

On June 11, 2015, the same date the citations purported to have been filed, Lamb wrote to DCAC about "recent concerns regarding the treatment, transport, and handling of stray animals by" the company.  He stated:

> [W]e are concerned about recent violations of Dog Law by members acting as agents for your organization.  We are aware that [DCAC] has received a written warning from the Bureau of Dog Law Enforcement in the past few months, and we anticipate citations and violations to follow which may threaten both our reputation and standing with the Bureau due to our association with the actors.  Effective seven (7) days from this notification date, we intend to cease the acceptance of stray animals from [DCAC] due to these violations and the legal exposure that would inevitably follow due to our association.
>
> All municipalities currently paying for services provided by [DCAC] will be advised to use this seven (7) day grace period in order to pursue alternate means of addressing their animal control needs within their respective jurisdictions.  The [CCSPCA] is willing to assist them during the interim to ensure proper care and transportation of stray animals in accordance with Dog Law, as well as our own rules and regulations.  The interim

animal control services provided by [CCSPCA]
would be free of charge for a reasonable
amount of time as is required for these
municipalities to acquire alternate and
acceptable means.

On June 23, 2015, Lamb and "unspecified officials" of
DCAPB sent correspondence to all municipalities within Delaware
County stating that DCAC had been or was about to be charged with
criminal conduct and that CCSPCA would no longer accept its
deliveries of stray animals.  They reiterated CCSPCA's offer to
enter into animal control service contracts "to help fill the gap
left by" DCAC.

On the same day, Lamb and CCSPCA released "to the press"
portions of Donmoyer's letter of March 4, 2015, including the
sections asserting that DCAC had violated Pennsylvania law.  Lamb
and CCSPCA also released parts of CCSPCA's June 11, 2015 letter.
Some of these excerpts, including statements that plaintiffs would
be criminally cited, were later published by the local media.
Lamb was quoted by a local newspaper as saying "[w]e used to
receive 90 to 100 animals per month.  Now we're down to less than
50 a month. . . . The animals are no longer making their way to our
facility.  The owners don't have the option to reclaim them. . . .
[N]obody knows where the animals are being housed."  In the same
article, DCAPB's chairman was quoted as saying "[w]e've been aware
of problems with [DCAC] in the last few years and they've just
gotten worse."

Thereafter, all Delaware County municipalities with which plaintiffs had contracts cancelled those contracts and terminated their business relationships with plaintiffs.  According to plaintiffs, this turn of events was the "direct and proximate result of the public statements made by Defendant Lamb with the support and participation of Delaware County and the [DCAPB], the criminal charges filed against [DCAC] by Donmoyer and Loughlin and the publicity surrounding the initiation of those charges."  The citations filed against DCAC were eventually withdrawn.

II.

When ruling on a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and draw all inferences in the light most favorable to the plaintiff.  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008); Umland v. Planco Fin. Servs., Inc., 542 F.3d 59, 64 (3d Cir. 2008).  We must then determine whether the pleading at issue "contain[s] sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In making our determination, we may also consider matters of public record as well as any "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on that document."  Pension

-10-

Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d
1192, 1196 (3d Cir. 1993).

In order to survive a Rule 12(b)(6) motion to dismiss,
a claim must do more than raise a "mere possibility of
misconduct." Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d
Cir. 2009) (quoting Iqbal, 556 U.S. at 679). Under this
standard, "[t]hreadbare recitals of the elements of a cause of
action, supported by mere conclusory statements, do not
suffice." Iqbal, 556 U.S. at 678. Instead, the complaint must
contain factual matter sufficient to state a claim that is
facially plausible, meaning that "the plaintiff [has] plead[ed]
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged." Id. (citing Twombly, 550 U.S. at 556). This
plausibility standard "is not akin to a 'probability
requirement,' but it asks for more than a sheer possibility that
a defendant has acted unlawfully." Id. A complaint which
"pleads facts that are 'merely consistent with' a defendant's
liability . . . 'stops short of the line between possibility and
plausibility.'" Id. (citing Twombly, 550 U.S. at 557).

III.

We turn first to Count I and II, in which plaintiffs
allege violations of their "Fifth and Fourteenth Amendment Rights
to Pursue Chosen Occupation and to Private Employment" pursuant to

-11-

42 U.S.C. § 1983.[6]   Plaintiffs assert that they have "protected liberty and property rights under the Fifth and Fourteenth Amendments . . . to hold specific private employment, conduct private business, enter into contractual relationships and to follow a chosen profession without unreasonable government interference."   According to plaintiffs, these rights were violated when Delaware County established DCAPB without the proper authority to do so and when DCAPB and CCSPCA entered into a contract that was calculated to terminate plaintiffs' access to shelter facilities and to exclude them from conducting business within Delaware County.   Plaintiffs further plead that Donmoyer and Loughlin violated their rights by issuing citations against DCAC "for the purpose of assisting . . . Lamb, CCSPCA and [DCAPB] to provide cause for barring Plaintiff's business access to CCSPCA's shelter."

> In relevant part, § 1983 provides:
>
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

---

6.  Count I pleads these violations against Delaware County, DCAPB, Lamb, and CCSPCA, while Count II pleads them against Donmoyer and Loughlin.

Section 1983 does not create substantive rights in and of itself, but instead provides a remedy for violations of constitutional or other federally established rights.  Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  In order to state a claim for relief under § 1983, a plaintiff must allege that it has been subjected to such a deprivation and that the deprivation "was committed by a person acting under color of state law."  Id. (internal citations omitted).

     As an initial matter, plaintiffs have failed adequately to allege that they were subjected to a deprivation of their Fifth Amendment rights.  See Kneipp, 95 F.3d at 1204.  The Due Process Clause of the Fifth Amendment regulates the conduct of the federal government, not state or local actors.  See, e.g., B&G Constr. Co., Inc. v. Dir., Office of Workers' Comp. Programs, 662 F.3d 233, 247 n.14 (3d Cir. 2011).  The constitutional claims that serve as the basis for plaintiffs' reliance on § 1983 are not grounded in any alleged federal government conduct.  Insofar as plaintiffs' § 1983 claims plead Fifth Amendment violations, they will be dismissed.

     Plaintiffs' constitutional claims are also grounded in the Due Process Clause of the Fourteenth Amendment, which proscribes state or municipal deprivations of life, liberty, or property without due process of law.[7]  Thomas v. Independence Twp.,

---

7.  In response to the pending motions, plaintiffs insist that their claims implicate "Fourteenth Amendment *liberty interests*

463 F.3d 285, 297 (3d Cir. 2006).  In determining whether this proscription has been violated, "we must first ask whether the asserted individual interests are encompassed within the [F]ourteenth [A]mendment's protection of 'life, liberty or property'; if protected interests are implicated, we then must decide what procedures constitute 'due process of law.'"  Unger v. Nat'l Residents Matching Program, 928 F.2d 1392 (3d Cir. 1991) (quoting Robb v. City of Phila., 733 F.2d 286, 292 (3d Cir. 1984)).

It appears to be plaintiffs' position that they were deprived of both liberty and property interests.  We first address their liberty interest claim.  Among other things, the Fourteenth Amendment protects "the liberty to pursue a calling or occupation." Piecknick v. Comm. Of Pa., 36 F.3d 1250, 1259 (3d Cir. 1994). However, this protection does not extend to "the right to a specific job."  Id.  In other words, while "state actions that threaten to deprive persons of the right to pursue their chosen occupation" are actionable under the Due Process Clause, "[s]tate actions that exclude a person from one particular job" are not.

---

only, not Fourteenth Amendment due process." (Emphasis in original.)  This overlooks the fact that the kinds of deprivations asserted by plaintiffs are properly analyzed as due process violations.  E.g., Mathews v. Eldridge, 424 U.S. 319, 332 (1976); see also Sammon v. N.J. Bd. of Med. Exam'rs, 66 F.3d 639, 645 (3d Cir. 1995).  Furthermore, plaintiffs' arguments in support of their claims are all grounded in a Fourteenth Amendment due process framework.

Id. (quoting Bernard v. United Twp. High Sch. Dist. No. 30, 5 F.3d 1090, 1092 (7th Cir. 1993)).

Plaintiffs urge that the actions of defendants have, in fact, deprived them of the right to pursue their chosen occupation because they have been shut out of an "entire field of employment," that is animal control.  This argument is belied by the facts set forth in their second amended complaint.  Plaintiffs have not alleged that they are now barred from all work in their chosen field of animal control.  They do not claim, for example, that the actions of defendants prevent them from working in other counties or municipalities or from contracting with private individuals. They merely assert that defendants deprived them "of the means of performing their contractual duties with Delaware County municipalities."  These municipal contracts are the type of "specific job" that falls outside the reach of the Fourteenth Amendment.  See Piecknick, 36 F.3d at 1259.  Plaintiffs have not adequately pleaded a deprivation of their "liberty to pursue a calling or occupation."  See id.

The decision of the Western District of Pennsylvania in Kepler v. Mirza, 102 F. Supp. 2d 617 (W.D. Pa. 1999), supports our conclusion.  That case involved claims brought by the partners of a firm that performed ecological restoration on sites that had been mined for coal.  Id. at 618.  Typically, to receive the necessary permits to conduct mining operations, mining companies needed to

-15-

submit restoration plans to the local District Mining Office for
the district in which the operations would be located.  Id. at
618-19.  Individual District Mining Managers would then decide
whether to issue the permits.  Id.  Mining operators would contract
with companies like that owned by plaintiffs to develop these
restoration plans.  Id.  The plaintiffs alleged that the District
Mining Manager for the Knox District, in which the bulk of their
operations were based, became hostile toward them, threatened to
put them out of business, and began to refuse to issue permits for
their restoration plans.  Id. at 620.  In effect, they claimed,
this rendered them unable to do business within the Knox District.
Id.

On consideration of a motion for summary judgment, the
Kepler court articulated the question before it as whether the
disputed state action had "merely curtailed the Plaintiff[s']
occupational liberty or . . . unreasonably interfered with or
deprived them of that liberty."  Id. at 623.  It determined that
the right of the plaintiffs to pursue their occupation, "although
possibly curtailed or limited in some way, was not 'severely
limited,' unreasonably altered or outright deprived" by the
defendants' conduct.  Id. at 625.  The plaintiffs, the court noted,
could find work outside the district in which they typically
worked, and had "allege[d] few specific instances in which they
submitted a plan or applied for work and were denied."  Id. at 626.

-16-

Put simply, the plaintiffs had not shown a deprivation of their liberty interest in pursuing their occupation.  Id.

Plaintiffs here have similarly failed to plead sufficient facts to show that their liberty interest in their chosen occupation was "'severely limited,' unreasonably altered or outright deprived."  Id. at 626.  Their second amended complaint falls short of stating a § 1983 claim based on a deprivation of a Fourteenth Amendment liberty interest.  Counts I and II will therefore be dismissed to the extent that they attempt to allege such claims.

Plaintiffs also urge that their constitutionally protected property interests are at stake.  In order to establish a property interest for due process purposes, a plaintiff must demonstrate a "legitimate claim of entitlement to" the benefit at issue.  Pieknick, 36 F.3d at 1256.  To do so, the plaintiff must show "entitlement to a property interest created expressly by state statute or regulation or arising from government policy or a mutually explicit understanding between a government employer and an employee."  Id. (quoting Carter v. City of Phila., 989 F.2d 117, 120 (3d Cir. 1993).  This is because due process property interests generally arise not from the constitution itself but from "existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits

and that support claims of entitlement to those benefits." Robb, 733 F.2d at 292 (citation omitted).

A state actor's breach of a contract can, but does not necessarily, amount to a deprivation of a property interest for due process purposes. Unger, 928 F.2d at 1398. It is therefore "necessary to distinguish between 'mere' contract rights and property rights created by contract." Id. (quoting Yatvin v. Madison Metro. Sch. Dist., 840 F.2d 412, 416 (7th Cir. 1988)). Our Court of Appeals has recognized two general types of contract rights that amount to property interests: those that "arise[] where the contract confers a protected status" such as tenure or entitlement to welfare benefits, and those that "arise[] where the contract itself includes a provision that the state entity can terminate the contract only for cause." Id. at 1399 (citations omitted). In general, courts have been reluctant to find due process property rights in contractual interests "that are not associated with any cognizable status of the claimant beyond its temporary role as a government contractor." E.g., id. (quoting S & D Maint. Co., Inc. v. Goldin, 844 F.2d 962, 67 (2d Cir. 1988)). A party's "interest in enforcement of an ordinary commercial contract with a state is qualitatively different from . . . 'property' entitled to procedural due process protection." S & D Maint. Co., Inc., 844 F.2d at 966.

-18-

Plaintiffs have not submitted to the court the contracts between DCAC and the various Delaware County municipalities and have provided no details about their terms.  Even more significantly, they have not pleaded that those contracts confer on them any protected status or contain provisions barring their termination except for cause.  See Unger, 928 F.2d at 1398. Plaintiffs merely allege that Pennsylvania law grants municipalities the exclusive authority to contract with state-licensed parties for animal control services and that DCAC, which was so licensed, held contracts with certain Delaware County municipalities.  We conclude that these contracts gave rise to precisely the type of commercial interest that is "qualitatively different" from the sort of protected status that is entitled to due process protection.  See S & D Maint. Co., Inc., 844 F.2d at 966.  To the extent that plaintiffs also assert a property interest in their access to CCSPCA's facilities (and it is not clear that they do), they have similarly failed adequately to plead that this is the type of entitlement that would give rise to a due process claim.  Counts I and II will be dismissed insofar as they seek to allege a deprivation of plaintiffs' property interests.

In response to several of the pending motions to dismiss, plaintiffs imply that their claims also sound in substantive due process.  This is inconsistent with their reliance on authority that sets forth a procedural due process framework.

-19-

Nonetheless, if we were to treat plaintiffs' claims as alleging substantive due process violations, those claims would fail.  In order to prevail on a substantive due process claim like the one before us, a plaintiff "must establish as a threshold matter that he has a protected property interest to which the Fourteenth Amendment's due process protection applies."  Nicholas v. Pa. State Univ., 227 F.3d 133, 139-40 (3d Cir. 2000) (quoting Woodwind Estates, Ltd. v. Gretkowski, 205 F.3d 118, 123 (3d Cir. 2000)). Moreover, in order to fall within the scope of substantive due process, an interest must be "constitutionally fundamental."  Id. at 141 (citation omitted); see also Reich v. Beharry, 883 F.2d 239, 244 (3d Cir. 1989).  The right to practice a particular profession is not fundamental for constitutional purposes.  See, e.g., Sammon, 66 F.3d at 645.  Nor are state-law contract rights.  See, e.g., Nicholas, 227 F.3d at 142.  Taking plaintiffs' allegations as true, we have already determined that they have failed to allege any constitutionally-protected interest.  See id. at 140.  Even if they had succeeded in doing so, the interest alleged would not be fundamental and thus would not be entitled to substantive due process protection.  See id. at 142; Sammon, 66 F.3d at 645.  For these reasons, any substantive due process arguments advanced by plaintiffs must necessarily fail.

In sum, we conclude that plaintiffs have failed adequately to allege that they have been deprived of any

-20-

constitutionally protected right or interest.  As a result, their
§ 1983 claims contained in Counts I and II fail.  See Kneipp, 95
F.3d at 1204.  We need not reach the remaining arguments of
defendants as to why Counts I and II fail to state a claim.

IV.

In Counts III, IV, and V, plaintiffs assert additional
claims that hinge on defendants' purported violation of their
constitutional rights.  Count III is styled as "42 U.S.C. § 1983:
Conspiracy to Violate Plaintiffs' Fifth and Fourteenth Amendment
Rights to Pursue Chosen Occupation and [t]o Private Employment" and
alleges that Lamb, CCSPCA, DCAPB, Donmoyer, and Loughlin conspired
to deprive plaintiffs of their constitutionally-protected
interests.  Count IV, styled "42 U.S.C. § 1983: Malicious Abuse of
Process," alleges that Donmoyer and Loughlin improperly filed
citations against plaintiffs with the sole purpose of providing
Lamb and CCSPCA the grounds to exclude them from using CCSPCA's
facilities "and thereby deprive Plaintiffs of access to means of
conducting private employment, conducting private business,
entering into contractual relationships and following a chosen
profession in violation of" their constitutional rights.  Finally,
Count V is entitled "42 U.S.C. 1983: Conspiracy to Commit Malicious
Abuse of Process" and alleges that Lamb, CCSPCA, Donmoyer, and
Loughlin conspired in Donmoyer and Loughlin's filing of the

aforementioned citations, again for the sole purpose of depriving plaintiffs of their constitutional rights.

Any claim brought under § 1983 can only survive a Rule 12(b)(6) motion if the plaintiff has adequately alleged that he was deprived of a constitutional right by a party acting under color of state law.  Lazaridis v. Wehmer, 591 F.3d 666, 672 (3d Cir. 2010). This is true even with respect to § 1983 conspiracy claims.  Where no constitutional violation has been pleaded, no conspiracy claim can be maintained under § 1983.  Id.; Holt Cargo Sys., Inc. v. Del. River Port Auth., 20 F. Supp. 2d 803, 843 (E.D. Pa. 1998).  It is also true with respect to § 1983 malicious abuse of process claims, which can only succeed if the plaintiff has adequately alleged a violation of a constitutional right.  See, e.g., Garner v. Twp. of Wrightstown, 819 F. Supp. 435, 445 (E.D. Pa. 1993) (citing S. Nahmod, Civil Rights and Civil Liberties Litigation § 3.15 (3d ed. 1991)).[8]  Because we have already determined that plaintiffs have failed adequately to allege a constitutional violation, we conclude

---

8.  Plaintiffs' malicious abuse of process claim fails for an additional reason:  instead of alleging that the proceedings against them were "initiated legitimately and thereafter . . . used for a purpose other than that intended by the law," they plead that the citations were initiated for an illegitimate purpose.  See Rose v. Bartle, 871 F.2d 331, 350 n.1 (3d Cir. 1989).  Our Court of Appeals has held that a plaintiff's allegations that the proceedings against him were "improper from the start" merit dismissal of malicious abuse of process claims. See, e.g., Milburn v. City of York, 612 F. App'x 119, 123 (3d Cir. 2015); Boldrini v. Wilson, 542 F. App'x 152, 154 n.1 (3d Cir. 2013)

that plaintiffs have failed to state claims for conspiracy,
malicious abuse of process, or conspiracy to commit malicious abuse
of process under § 1983.  We will therefore dismiss Counts III, IV,
and V.

V.

We are left only with plaintiffs' state-law claims.
They are Count VI, which alleges that Lamb, CCSPCA and DCAPB are
liable for "tortious interference with business relationships and
prospective business relationships," and Count VII, which asserts
that Lamb and CCSPCA are liable for commercial disparagement.
Pursuant to 28 U.S.C. § 1367(c)(3), we have discretion to decline
to exercise supplemental jurisdiction over state-law claims once we
have dismissed all claims over which we have original jurisdiction.
In such a situation, it is appropriate for us to refrain from
exercising jurisdiction over the state-law claims "in the absence
of extraordinary circumstances."  Tully v. Mott Supermarkets, Inc.,
540 F.2d 187, 196 (3d Cir. 1967).  Particularly in view of the fact
that this is essentially a local dispute, better served by the
state courts, we will decline to exercise jurisdiction over Counts
VI and VII.